IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUL 21 2014

```
------------------------------------------X
PAULETTE MARTIN,                          )
                                          )
            Petitioner,                   )
                                          )        RWT 14-2315
                                          )
v.                                        )   Case No.: 04 Cr 235
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
            Respondent.                   )
------------------------------------------X
```

## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO TITLE 28 U.S.C. § 2255

NOW COMES, Paulette Martin ("Petitioner") respectfully submitting this Motion, pursuant to Title 28 U.S.C. § 2255, to vacate, set aside or otherwise correct her sentence, which she submits is unconstitutional and unjust.

Date: June 30, 2014

Respectfully submitted,

Paulette Martin, Pro se
Reg. No.: 38350-037
FCI Aliceville, Unit B1
P.O. Box 4000
Aliceville, AL 35442

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
-----------------------------------------------X
PAULETTE MARTIN,                        )
                                        )
            Petitioner,                 )
                                        )
v.                                      )     Case No.: 04 Cr 235
                                        )
UNITED STATES OF AMERICA,               )
                                        )
            Respondent.                 )
-----------------------------------------------X
```

JUL 2 1 2014

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

NOW COMES, Paulette Martin ("Petitioner") respectfully submitting this Memorandum of Law in Support of Motion, pursuant to Title 28 U.S.C. § 2255, to vacate, set aside or otherwise correct her sentence, which she submits was obtained in violation of her Sixth Amendment Right of the Constitution of the United States.

### JURISDICTION

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a court established by an Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States...or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." Observing that a habeas petition is preferable to direct appeal

2

for resolving ineffective claims since district court is "a forum best suited to developing the facts necessary to determining the adequacy of representation...," the Supreme Court has held that a petitioner may bring an ineffective claim whether or not he could have raised the claim on direct appeal. *Massaro v. United States*, 538 U.S. 500, 505 (2003).

Similarly, claims of ineffective assistance of counsel "are generally not cognizable on direct appeal... unless it conclusively appears from the record that defense counsel did not provide effective representation." *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008)(internal quotation marks omitted). Rather, to allow for adequate development of the record, ineffective assistance claims generally should be raised in a 28 U.S.C. § 2255 motion, *see, United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010), especially where, as here, petitioner was represented by the same attorney, Mr. Michael Montemorano, Esq., at both the trial and appellate levels.

Petitioner, currently incarcerated at FCI Aliceville, in Aliceville, Alabama, so moves this Court on the ground that the sentence imposed resulted from a profound deprivation of her constitutional right to effective assistance of counsel.

## REVIEW STANDARDS

The legal standards for preliminary and final review of motions seeking relief under 28 U.S.C. § 2255 are jointly expressed in the "Rules Governing § 2255 Cases in United States District Courts" (hereinafter, the "Rules") and the text of 28 U.S.C. § 2255 which provides, in pertinent part:

> [u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto (*emphasis supplied*).

3

Similarly, Rule 4 dictates that upon initial consideration by the assigned District Court Judge, a §

2255 motion should be dismissed only "if it *plainly* appears from the motion, any attached

exhibits, and the record of prior proceedings that the moving party is not entitled to relief

(*emphasis supplied*)." In all other cases, "the judge must order the United States attorney to file

an answer, motion, or other response within a fixed time, or to take action the judge may order."

*Id.* Where appropriate, Rule 4 permits the Court to order discovery, expand the record and hold

an evidentiary hearing.

The ultimate legal standard applicable to motions seeking relief under 28 U.S.C. §

2255 is prescribed by statute:

> If the court finds that...the sentence imposed was not authorized by law or
> otherwise open to collateral attack, or that there has been such a denial or
> infringement of the constitutional rights of the prisoner as to render the judgment
> vulnerable to collateral attack, the court shall vacate and set the judgment aside
> and shall discharge the prisoner or resentence him or grant a new trial or correct
> the sentence as may appear appropriate.

## JUDICIAL NOTICE

This Honorable Court has jurisdiction to adjudicate all matters contained herein, pursuant

to Title 28 U.S.C. Section 2255. In support of the foregoing motion, Petitioner respectfully

requests that this Honorable Court take judicial notice that this motion is being submitted pro se

and that she is unskilled and untrained in the law. Thus, Petitioner humbly asks that the claims

presented herein will be liberally construed and that her arguments be given great difference

irrespective of whether she has articulated each and every point as deftly as a skilled practitioner

of the law would. In making this request, Petitioner relies on *Korsunkiy v. Gonzales*, 461 F.3d

847, 850 (7th Cir. 2006), holding that "if the Judge can see at what the Pro-Se Litigant is driving

at that is enough", as well as *Haines v. Kerner*, 404 U.S. 519 (1972), which held that the courts

should not hold a pro se litigant to the standards of a professional litigator because pro se

submissions are often written without the benefit and assistance of counsel or the aide of a person adequately trained in the practice and procedures of the law. Therefore, allegations in a pro se motions are to be held to a less stringent standard than formal pleadings drafted by a professional litigator.

Furthermore, Petitioner prays that this Honorable Court appoint counsel to assist her in presenting and articulating this very complex *ALLEYNE* claim raised within, which, with counsel's appointment, would be presented in a much clearer, concise and distinct form. Specifically, Petitioner request the appointment of James Wyda, of the Federal Public Defenders' Office in Baltimore, Maryland, as the *ALLEYNE* claim that Petitioner has articulating in this brief is the very claim that Mr. Wyda made to the Supreme Court in *Deleon v. United States*, 133 S.CT. 2850 (2013), which was remanded back to the United States Fourth Circuit Court of Appeals, in light of *Alleyne*.[1]

Therefore, in light of judicial economy and the complexity of litigating her *ALLEYNE* claim, appointment by counsel who is most familiar with the issues presented within will be far more effective use of the court's resources than to appoint counsel unfamiliar with the points and concepts articulated within the *Alleyne* section of the brief.

## PROCEDURAL HISTORY

On May 5, 2004, a grand jury in the District of Maryland returned an indictment charging about 20 individuals, including Petitioner with conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine, one kilogram or more of heroin, and 50 grams or more of cocaine base, commonly known as crack, all in violation of 21 U.S.C. § 841(a). The indictment was superseded several times, and a fourth superseding indictment charged 30

---

[1]     It should be noted that *Deleon* was remanded back to the district court for improper judicial fact-finding which violated his Sixth Amendment right to a jury determination of all the elements that constitute the punishment. *United States v. Deleon*, 2013 U.S. App. LEXIS 1950 (4TH Cir. 2013).

defendants, including Petitioner with the original charges as well as other related charges. Eventually a Fifth Superseding Indictment followed, which, charged Petitioner specifically with conspiracy to distribute and possess with intent to distribute five kilogram or more of cocaine, one kilogram or more of heroin, and 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (a)(1) (Count One); with use of a communication devise in furtherance of the drug conspiracy charged in Count One in violation of 21 U.S.C. § 843(b) (Count Three, Five, Seven, Nine, Eleven through thirteen, Fifteen, Seventeen through Twenty-Four, Twenty-Six through Twenty-Eight, Thirty, Thirty-Two, Thirty- Five, Thirty-Seven, Thirty-Nine, Forty-Two, Forty- Four, Forty-Six through Fifty-Four, Fifty-Seven and Fifty-Eight ); with possession with intent to distribute a control substance , in violation of 21 U.S.C. § 841(a)(1) (Count Fourteen, Twenty- Five, Twenty-Nine, Thirty-One, Thirty-Three, Thirty- Eight, Forty-Three and Forty-Five; with possession with intent to distribute 50 grams or more of crack/cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count Eight, Forty and Fifty-Six); with possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 841 (a)(1) (Counts Four, Ten, Sixteen and Fifty-Five); with possession with intent to distribute five gram or more of cocaine in violation of 21 U.S.C. § 841(a)(1) (Count Sixty-Two)

On June 6, 2006, Petitioner appeared before this court and exercised her Sixth Amendment Right of the Constitution of the United States and proceeded to a jury trial. After a forty-two day jury trial, Petitioner was found guilty on all counts and acquitted on one count: Count Twenty-Two.   In preparing the Presentence Report the U.S. Probation Department attributed 150 kilograms or more of powder cocaine, over 1.5 kilograms of cocaine base and approximately 20 kilograms of heroin to Petitioner and determined a base offense level of 38. The base offense level was then adjusted two levels upwards for possession of a firearm by a

6

codefendant, pursuant to U.S.S.G. § 2D1.1(b)(1) and U.S.S.G. § 1B1.3(A).   Thereafter, Petitioner's base offense level was further enhanced four levels upwards for being a leader/organizer of a criminal activity which involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a).

At sentencing, the court determined that Petitioner's combined Criminal Offense Level was 44 and her Criminal History Category was I, and on January 5, 2007, imposed a sentence of LIFE imprisonment and ten years of supervised release on Count One, and sentences of 48 months imprisonment and one year of supervised release and 60 months imprisonment and three years of supervised released on other related Counts.  On December 10, 2010, this Court entered an Amended Judgment basically imposing the same sentence pronounced on January 5, 2007. On December 10, 2010, Petitioner filed a timely notice of appeal and on November 2, 2011, the U.S. Court of Appeals for the Fourth Circuit affirmed in part, vacated in part and remanded the case back to the district court.  Thereafter, on November 28, 2011, the U.S. Court of Appeals for the Fourth Circuit issued a mandate in this case and on November 30, 2011, the U.S. Court of Appeals for the Fourth Circuit again affirmed the judgment of the district court.  However, on December 9, 2011, the U.S. Court of Appeals for the Fourth Circuit stayed the mandate "pending disposition of the petition or mandate."  Then finally on December 30, 2011, the U.S. Court of Appeals issued an order making its mandate effective that day.

As detailed in Petitioner's Affidavit in Support of her Title 28 U.S.C. § 2255 motion, on May 29, 2012, a "Motion for Retroactive Application of Sentencing Guidelines to Crack Cocaine Offense" pursuant to Title 18 USC § 3582 was filed in this court.  See, ECF No. 1518.[2]  On June 11, 2012, a Supplement to the "Motion for Retroactive Application of Sentencing Guidelines to

---

[2]     It should be noted that this document is not accessible through PACER as any attempt to download is met with a warning that "You do not have authorization to view this document."

Crack Cocaine Offense", ECF No. 1518 was filed. See, ECF No. 1524. On August 8, 2012, this Honorable Court issued an Order in which the Court informed Petitioner of its intention to construe ECF No. 1518 as a 28 USC § 2255. See, ECF No. 1539. On August 15, 2012, a Motion for Reconsideration and Prayer to the court was filed. See ECF No. 1546. On August 21, 2012, Petitioner wrote a letter to this Court asking it to rule on the motion as filed and not to construe ECF No. 1518 as a 2255 motion. See ECF 1548. On August 28, 2012, this Court issued an order denying Petitioner's Motion for Reconsideration. See, ECF No. 1551 and on October 2, 2012, Petitioner filed a motion asking this Court to reconsider its denial of Petitioner's Motion for Reconsideration. See, ECF No. 1568.

On June 14, 2013, Petitioner again wrote the Court asking it "not to construe the motion for Resentencing and A Challenge to a Wrongful Conviction," ECF No. 1524, as a 2255, but that the court should consider a 2255 that was supposed to have been prepared and filed by an attorney, Mr. David Bernstein, who Petitioner had retained to perfect and file a 2255 on her behalf.[3] On August 26, 2013, the Court issued an Order denying ECF No. 1568. See, ECF No. 1638 and on November 7, 2013, the Court issued an order informing Petitioner that it did not receive the 2255 filed by Petitioner's retained attorney, David Bernstein. The Court then reiterate to Petitioner its intention to construe the motion in ECF No. 1518 as a 2255 Motion to Vacate, unless Petitioner respond in writing within twenty-eight days. See, ECF No. 1657.

On December 26, 2013, an order issued on 11/07/2013 was returned to the court undelivered as it was apparently inadvertently sent to a different institution than the one petitioner is currently housed. This seemed to have occurred in spite of the fact that Petitioner's August 23, 2013 letter to the court reflected that her new address was FCI Aliceville, P.O. Box

---

[3]     Mr. Bernstein had previously represented to Petitioner that he did in fact file her 2255 motion on February 18, 2013. See, ¶ 28 and exhibit, F of Petitioner's Affidavit in Support of her Title 28 U.S.C. § 2255.

4000, Aliceville, AL 35442, see ECF No. 1637; and in spite of the fact that the court had previously sent correspondence to both Petitioner at FCI Aliceville, Alabama, as well as the warden at FCI Aliceville, Alabama. See ECF No. 1661, 1660.

On December 21, 2013, Petitioner wrote a letter to the court informing the court that she only became aware of the Court's November 7, 2013 Order through a recent search of her docket sheet. Petitioner also respectfully request an additional 120 days, to develop and properly file a 2255 motion as a result of the fact that she did not received the 11/07/2013 Order. See, ECF No. 1670. On January 2, 2014, in light of the fact that Petitioner had never received the Court's November 7, 2013, Order, the Court issued another Order informing Petitioner of its intention to construe the ECF No. 1518 motion as a 2255. Thereafter, the Court notified Petitioner that she has twenty-eight days in which to either, supplement the motion, withdraw the filing, or have it ruled upon as filed. See ECF No. 1668. On January 3, 2014, the Court issued a Memorandum in which it directed the clerk to docket Petitioner's "correspondence as a Motion for Leave of 120 Days to File a 28 U.S.C. § 2255 Motion." The Court also directed the Government to respond to Petitioner motion "within 30 days." See, ECF No. 1669.

As it has been some five months now since the Court issued its 01/03/2014 Memorandum and Order, this matter is ripe for adjudication.

## MEMORANDUM OF LAW

### Issue I.

### WHETHER PETITIONER'S MOTION TO VACATE SET ASIDE OR CORRECT SENTENCE PURSUANT TO TITLE 28 U.S.C. § 2255 IS TIMLEY

The AEDPA's "statute of limitation defense... is not 'jurisdictional,'" Day v. McDonough, 547 U.S. 198, 205,213, it is subject to a "rebuttable presumption" in favor "of equitable tolling," Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96.

9

A § 2255 petitioner ordinarily has one year from the date on which his conviction becomes final in order to file a motion to vacate. 28 U.S.C. § 2255 (f)(1). However, the statute of limitations in § 2255(f)(1) may be equitably tolled in certain circumstances. Specifically, equitable tolling applies if the petitioner can show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Relief is limited to cases "where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result ." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir.2004).

In *Holland v. Florida*, 560 U.S. 631 (2010) a case that asked how equity should be applied once the statute is recognized the Supreme Court reviewed an Eleventh Circuit rule holding that attorney negligence in failing to meet a filing deadline may never serve as a basis for equitable tolling absent a showing of "bad faith" or "dishonesty" on the part of the attorney. 560 U.S. at 644. The *Holland* Court rejected this rule as overly rigid, noting equity's longstanding role in habeas relief and declaring that principles of equitable tolling are consistent with the "AEDPA's basic purpose of eliminating delays without undermining basic habeas corpus principles by harmonizing the statute with prior law, under which a petition's timeliness was always determined under equitable principles." *Id.* at 648. In light of this, the Court held that the AEDPA's statutes of limitations "do[ ] not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" *Id.* at 645 (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2010)). The Court further explained that, while courts of equity are of course governed by "rules and precedents," equity also requires "flexibility" and the avoidance of "mechanical rules." *Id.* at 649–50 (internal quotation marks and citations omitted); see also *id.* at 650 (courts

10

must "exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case").

Though the Eleventh Circuit's *Holland v. Florida,*539 F. 3d 1334 (CA11 2008), rigid view of a petitioner seeking to excuse late filing on the basis of his/her attorney's unprofessional conduct has been modified by *Holland v. Florida,* 560 U. S. 631 (2010), Petitioner submits to the Court that the facts of her case, attested to in her affidavit, supports the fact that the attorney she hired to perfect her 2255 was not only "grossly negligent", but that such negligence "r[o]se to the level of egregious attorney misconduct" 539 F. 3d at 1339, warranting equitable tolling. The facts in this case show that her attorney, David Bernstein, a member of the bar of the State of Florida, a state within the U. S. Eleventh Circuit Court of Appeals, was both "dishonest" in his dealing with Petitioner as well as acted in "bad faith."

In *United States v. Pace, supra,* the Supreme Court have previously made clear that a "petitioner" is "entitled to equitable tolling" only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. *Id.*, 544 U. S. at 418 (emphasis deleted). However, the Supreme Court also held that courts of equity "must be governed by rules and precedents no less than the courts of law." *Lonchar* v. *Thomas* , 517 U. S. 314, 323 (1996) (internal quotation marks omitted). Moreover, the Supreme Court has also made clear that often the "exercise of a court's equity powers ... must be made on a case-by-case basis." *Baggett* v. *Bullitt* , 377 U. S. 360, 375 (1964).

Of Course "a garden variety claim of excusable neglect," *Irwin,* 498 U. S., at 96, such as a simple "miscalculation" that leads a lawyer to miss a filing deadline, *Lawrence v. Florida,* 549 U.S. 327 (2007) at 336, does not warrant equitable tolling. A group of teachers of legal ethics

11

tells us that these various failures violated fundamental canons of professional responsibility, which require attorneys to perform reasonably competent legal work, to communicate with their clients, to implement clients' reasonable requests, to keep their clients informed of key developments in their cases, and never to abandon a client. *See, Brief for Legal Ethics Professors et al.*, as *Amici Curiae* (describing ethical rules set forth in case law, the Restatements of Agency, the Restatement (Third) of the Law Governing Lawyers (1998), and in the ABA Model Rules of Professional Conduct (2009)).

To be sure, a liberal read of Petitioner's affidavit in support of her Title 28 U.S.C. § 2255 Motion easily establishes the fact that Petitioner has met the requirement for "equitable tolling" of her Title 28 U.S.C. § 2255 Motion.  First Petitioner demonstrates "'(1) that [s]he has been pursuing h[er] rights diligently, and (2) that some extraordinary circumstance stood in h[er] way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  Furthermore, even applying the more rigid stand articulated by the Eleventh Circuit Court of Appeals in *Holland v. Florida*, 539 F. 3d 1334 (CA11 2008), Petitioner represents that she still meets the requirement for late filing on the basis of her attorney's unprofessional conduct, in that her affidavit further supports the fact that not only was her attorney "grossly negligent" but that his actions were "egregious" and that he operated in "bad faith," was 'deceitful' and "dishonest." *Id.*, at 1339.

As in the case of the Petitioner Holland in *Holland*, 560 U.S. 631, the attorney for Petitioner in this current case at bar "failed to file [Petitioner's] federal petition on time despite [Petitioner's] many letters [and emails] repeatedly emphasiz[ing] the importance of his doing so." Petitioner's attorney David Bernstein "apparently did not do the research necessary to find out the proper filing date, despite [Petitioner's] letters [and emails] that went so far as identify

12

the applicable [due date of filing of the petition.]" *Holland* at __. Also, as in *Holland*, 560 U.S. 631, Petitioner not only "wrote h[er] attorney numerous letters [and emails] seeking crucial information and providing directions; [s]he also repeatedly contacted the ... court" *id.*, at __ and even went a step further be searching the docket sheet on PACER.

The diligence required for equitable tolling purposes is "'reasonable diligence,'" see, *e.g.*, *Lonchar*, 517 U. S., at 326, not "'maximum feasible diligence,'" *Starns* v. *Andrews*, 524 F. 3d 612, 618 (CA5 2008) (quoting *Moore* v. *Knight*, 368 F. 3d 936, 940 (CA7 2004)).

Notwithstanding, in light of recent Supreme Court authority in *Martinez v. United States*, 132 S. Ct. 2455 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013) which permits a habeas corpus petitioner challenging her conviction to assert the ineffective assistance of post-conviction counsel as "cause" to excise her procedural default of a claim that her defense counsel was constitutionally ineffective for not raising, this Honorable Court may still exercise jurisdiction to avoid a fundamental miscarriage of justice where the petitioner can demonstrate by clear and convincing evidence that she was not subject to the greater separate offense than she was sentenced under which her jury verdict supports. As Justice Rutledge stated over 65 years ago, "the writ should be available whenever there clearly has been a fundamental miscarriage of justice for which no other adequate remedy is presently available." *Sunal v. Large*, 332 U.S. 174, 189 (Rutledge, J. dissenting). Accordingly, this Honorable Court has jurisdiction to entertain petitioner's claims and ORDER the government to respond accordingly under the case of parties' doctrine. See, *Whiteside v. United States*, 2014 U.S. App. LEXIS (4th Cir. 2014) (under the principle of equitable tolling a court may review the merits of a constitutional error at any time, which if left uncorrected, would result in a complete miscarriage of justice when the petitioner is only seeking to correct his sentence without attacking the conviction.)

13

Issue. II

## WHETHER PETITIONER'S SENTENCE IS VALID
## IN LIGHT OF *ALLEYNE V. UNITED STATES*

Retroactive Application

The Fourth Circuit in *Thomas v. United States*, 627 F.3d 534 (4th Cir. 2010), held that a district court may determine if a "right asserted was initially recognized by the Supreme Court and more retroactively applicable to cases on collateral review." (28 U.S.C. section 2255). Pursuant to *Thomas*, and under the principles established in *Teague v. Lane*, 489 U.S. 288 (1989), this court has the authority to make retroactive determination as to whether the right articulated in *Alleyne* is applicable to Petitioner's case at bar. *See, also, United States v. Cobb*, 2008 U.S. Dist. LEXIS 59927 (D. S. Car. 2008). Petitioner asserts that *Teague* does not bar application in this case and she is entitled to the benefit of *Alleyne* because *Teague* only prevents retroactive application of a "new rule" of criminal procedure. Petitioner submits that *Alleyne* is based on prior clearly established Supreme Court precedent and is in fact "old rule" which the *Teague* test does not implicate. In the alternate, if in the court's humble opinion that *Teague* is considered to be applicable to *Alleyne*, then it should still be deemed retroactive because if it's to be considered a new rule, it should at the very least be considered a "new *substantive* rule."

Petitioner's submits that her current sentence was imposed in violation of her Fifth Amendment right to Due Process and her Sixth Amendment right to Notice and Jury Trial, which was not consistent with the prior Supreme Court's precedent in *United States v. Carll*, 105 U.S. 611 (1881); *United States v. Hess*, 124 U.S. 483 (1888); *United States ex. Rel. Toth v. Quarles*, 100 L. Ed. 8 (1955); *In Re Winship*, 397 U.S. 358 (1970); *United States v. Gaudin*, 515 U.S. 506 (1995); *Jones v. United States*, 526 U.S. 215 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); *Cunningham v. California*, 549 U.S. 270

14

(2007); *United States v. O'Brien*, 130 S. Ct. 2344 (2012); *Southern Union v. United States*, 132 S. Ct. 2344 (2012) and *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

These case all support Petitioner's contention that her current sentence was imposed based upon impermissible judicial fact findings which increased her base offense level at least six levels; thus, resulting in a sentence far in excess of the prescribed punishment for that which the jury found her guilty of. The judicial fact findings that Petitioner was a leader/organizer; that she is responsible for a gun that her codefendant possessed; and that she's responsible for 20 kilograms of heroin, 150 kilograms of cocaine, and in excess of 1.5 kilogram of crack cocaine, all constitutes an increase in the minimum sentence that was authorized by her jury verdict, and were all arrived at in violation of Petitioner's Fifth and Sixth Amendment rights as well as in violation of *Carll, Hess, Quarles, Winship, Gaudin, Jones, Apprendi, Blakely, Cunningham, O'Brien, Southern Union,* and *Alleyne.*

Through *Alleyne*, the Supreme Court overturned the principles in *McMillian v. Pennsylvania*, 477 U.S. 79 (1986) and its offspring *United States v. Harris*, 536 U.S. 545 (2002). These two cases, in conjunction with the principles of Strict Liability, which the Sentencing Commission used in drafting the Sentencing Guidelines, were extensively used to promoted the concept that judicial fact-finding was not a violation of a defendant's Sixth Amendment right as long as they were called sentencing factors. In setting aside *McMillian* and *Harris*, the *Alleyne* Court found that any fact(s) which increases an offender's mandatory minimum sentence are element(s) of the crime and must be found by a jury beyond a reasonable doubt. *Id.*, at 2163.

*Alleyne*, is based on prior governing principles of *In Re Winship*, 397 U.S. 358 (1970) which was dictated by prior Supreme Court precedent in *United States v. Hess*, 124 U.S. 483 (1881) and enshrined in the Sixth Amendment. Petitioner's convict did become final before the

15

announcement of *Alleyne*, but after the clearly established principle of *Hess* and *Winship*. In addition, pursuant to the retroactive principle announced in *Griffith v. Kentucky*, 497 U.S. 314 (1987) *Alleyne* should apply to Petitioner on collateral review as if it was "old rule" pursuant to Title 28 U.S.C. § 2255(f)(3). Under the retroactive framework established in *Teague v. Lane*, 489 U.S. 288(1989), the Supreme Court set forth two regimes governing the retroactive application of the constitutional principles for criminal cases. *Teague* divided the world into two categories: "old rules" and "new rules." A rule is considered "new" for *Teague* purposes "if the result was not dictated by precedent existing at the time that the defendant's conviction became final." *Id.*, at 301.

*Teague* held that a "new rule" is retroactively applicable to cases on collateral review if, and only if, one of two exceptions apply: "(1) the new rule places certain kinds of criminal conduct beyond the power of the criminal law-making authority to proscribe; or (2) the new rule is a watershed rule of criminal procedure" that "alter[s] our understanding of bedrock procedural elements that must be found to vitiate the fairness of a particular conviction." *Teague*, 489 U.S. at 311. By contrast, an "old rule," applies on both direct and collateral review. *See, Whorton*, 549 U.S. 406, 416 (2007). Therefore, it is Petitioner's contention that *Alleyne* did not announce a "new rule" and that she should be entitled to invoke the principles announced in *Alleyne* even though her conviction was final before *Alleyne* was announced.

In other words, *Alleyne* simply reaffirmed the fact that a defendant's Fifth and Sixth Amendment rights are violated when a judge makes his own factual findings on a lesser standard of proof that leads the defendant to be sentenced to a greater sentence than she was convicted of. The constitution text requires that all facts relating to the allegation of a crime be stated in the indictment and presented to the jury, which the due process clause requires to be proven beyond

16

a reasonable doubt. Where, as here, the judge, at sentencing, nullifies the jury's findings by including additional findings which leads to greater offense levels and thus a greater sentence, such a sentence is unconstitutional.

Even if this Court finds that *Teague* applies to this case, it should still find *Alleyne* retroactively applicable to Petitioner because the Supreme Court overturned its own prior precedent in *McMillan* and *Harris*. Through *Alleyne*, the Court not only announced a new substantive rule that applies retroactively in this case, it also corrected a constitutional error that makes Petitioner's claim a constitutional structural error claim.

*Alleyne* is an "old rule" exception:

On June 17, 2013 the Supreme Court handed down its decision in *Alleyne v. United States*, 133 S.Ct. 2151 (2013) and held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury" to be found beyond a reasonable doubt. In coming to its decision, the *Alleyne* Court, overruled its own prior Supreme Court precedent in *Harris v. United States*, 536 U.S. 545 (2000) which was based on the logic of *McMillian v. Pennsylvania*, 477 U.S. 79 (1986) that a sentencing judge, by the civil standard of the preponderance of the evidence, can turn facts into "sentencing factors" as long as s/he did not surpass the statutory maximum.

Although the issues came up in a federal firearms prosecution case, the common-law principles of *Alleyne* are enshrined in the Sixth Amendment right that affects not only firearm statutes but all others statutes in which Congress has provided enhanced minimum penalties, i.e. drug quantity. In other words, if a statute makes it illegal to sell a drug and authorizes a ten year minimum mandatory sentence for such an offense, but provides for a twenty year minimum mandatory sentence for a sale of a large quantity of the same drug, the jury—rather than the

17

judge—have the right to make a fact finding of any element(s) that increases the statutory minimum that the judge will have authority to impose. Any fact that increases the mandatory minimum is an "element" which must be considered by the jury in order to preserves the jury's role as intermediary between the government and a criminal defendant.

*Alleyne* is a progeny of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that "other than a fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proven beyond a reasonable doubt." *Id.* The principles in *Alleyne*, is not a new novel approach because it is based on prior Supreme Court precedent. See *United States v. Carll*, 105 U.S. 611 (1881) and *United States v. Hess*, 124 U.S. 483 (1888). In *Carll* and *Hess* the Supreme Court held it was wrong to omit any substantive elements or facts that define the offense which the accused is facing and could be punished for. The *Hess* court stated, "it is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, including generic terms, it is not sufficient that the indictment shall charge the offense in the same generic term as in the definition, but must state the species. It must descend to particulars... The object of the indictment is, first, to furnish the accused with such a description of the charges against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment with reasonable particularity of time, place and circumstances." *Hess* at 487-488.

In *Hess,* Justice Field could not have put it any more convincing "first, to furnish the accused with such a description of the charges against him as will enable him to make his defense, and to avail himself of his conviction or acquittal for protection against a further prosecution for the same cause." *Hess,* at 487. The due process clause of the Fifth Amendment states that no person may "be deprived of life, liberty or property, without due process of law..." *In Re Winship,* 397 U.S. 358 (1970). The *Winship* court unequivocally and explicitly held that the reasonable doubt standard of due process clause protects an accused against conviction except "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" *Id.* The *Winship* court based its holding on several prior sound principles, which are applicable in this case and which includes the tenet that the reasonable doubt standard plays a vital role in the "American scheme of criminal procedure" by reducing · the rise of conviction based on "factual error" when a liberty interest is at stake.

As in *Winship,* Petitioner in this case lacked the fundamental fairness of due process when the crime for which the jury convicted her of carried a statutory maximum of 10 year and she was later sentenced to LIFE imprisonment under a civil standard of preponderance of the evidence. As Justice Frankfurter observed in *Leland v. Oregan,* 343 U.S. 790 (1952) "[i]t is the duty of the government to establish... guilt beyond a reasonable doubt. This notion—based in our law and rightly one of the boasts of a free society—is a requirement and safeguard of due process of law in the historic, procedural context of due process" *Id.* (dissenting opining). There should be no doubt that the holding in *Apprendi* relied on the common law constitutional requirements of *Winship,* which was decided long before *Apprendi.* Thus, the house of cards which petitioner's sentence is constructed of, including *McMillian v. Pennsylvania,* 477 U.S. 79 (1986), shook with *Apprendi* and collapsed with *Alleyne.*

19

The starting point for *Apprendi* and its progeny was always been dictated by *Winship* and "rooted in longstanding common-law practice," *Cunningham v. California*, 549 U.S. 270, 281 (2007). Although Petitioner's conviction became final before the pronouncement of *Alleyne,* but after the holding in *Hess* and *Winship,* Petitioner's sentence rests squarely on sound principles and clearly established prior Supreme Court precedent, which indicates that *Alleyne* should apply retroactively pursuant to the retroactive principles of *Griffith v. Kentucky*, 479 U.S. 314 (1987).

It is Petitioner's claim that *Alleyne* did not announce a new rule because *Alleyne* applies to a rule formulated in earlier cases and does not announce a new rule. In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court established a dichotomy governing whether states prisoners seeking federal habeas relief are entitled to the benefit of decisions announced after their conviction became final. Under, *Teague*, federal courts may not announce or apply "new rules" of criminal procedure on collateral review. "[A] case announces a new rule when it breaks new ground or new obligation on the State or the Federal Government." *Id.* at 301. By contrast, courts in collateral proceeding may grant relief that is "dictated by percent" at the time the conviction at issue became final. *Id.* A decision is dictated by precedent when it is "merely an application of the principle that governed" a prior Supreme Court case. *Id.*, at 307.

*Teague* itself provided an example of a decision that did not announce a new rule but rather was dictated by prior precedent: *Francis v. Franklin*, 471 U.S. 307 (1985). See, *Teague*, 489 U.S. at 307. *Francis* involved an application of *Sandstrom v, Montana*, 422 U.S. 510 (1979), in which the Supreme Court held that jury instructions "ha[ve] the effect of relieving the State of burden of proof" regarding mens rea violate due process. *Id.*, at 521. The instruction invalidated in *Sandstrom* had created a mandatory presumption concerning mens rea, while the instruction in *Francis* merely allowed the jury to presume mens rea. Consequently, the *Francis*

20

dissent argued that applying *Sandstrom's* logic to the instruction in *Francis* would "needlessly extent our holding in [*Sandstrom*] to cases where the jury was not required to presume conclusively and element of a crime under state law", 471 U.S. at 332 (Rehnquist, J., dissenting). But the *Francis* court rejected such a limitation on the general principle announced in *Sandstrom*. The *Francis* Court explained that the "distinction" between the instructions in the two cases "d[id] not suffice to call for qualification of the rule of *Sandstrom* and the wellspring due process principle from which it was drawn." *Id.*, at 316, 326. In the parlance of *Teague*, *Francis* shows that rejecting an untenable distinction does not announce a new rule: it simply enforces an old rule in a different context.

Numerous post-*Teague* decisions reinforce the notion that a decision applying a general principle announced in an earlier Supreme Court decision does not create a new rule, even when the rule is applied in a different context. See, e.g., *Stringer v. Black*, 503 U.S. 222, 229 (1992)(holding that, even though there were "difference" in use of aggravating factors under the Mississippi Capital Sentencing System [at issue in *Clemmons v. Mississippi*, 494 U.S. 738 (1990)] and their use in the Georgia system in [*Godfrey v. Georgia*, 466 U.S. 420 (1980)], *Clemmons* did not announce a new rule because "those differences could not have been considered a basis for denying relief in light of precedent existing at the time petitioner's sentence became final." As Justice Kennedy summarized, "[w]here the beginning point for a new decision is an earlier, more general rule designed for the specific purpose of evaluating a myriad of factual context, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Wright v. West*, 505 U.S. 277, 309 (1992).

By contrast an "old rule", applies to both direct and collateral review. See *Whorton v. Bocking*, 549 U.S. 406, 416 (2002). The Supreme Court explained in *Williams v. Taylor*, 529

21

U.S. 362, 412 (2000) that clearly established law is not "new" within the meaning of the retroactive principles of *Teague*, when the new decision is based on a prior precedent (in this case like *Hess* and *Winship*) that are applied to a new set of facts through its governing principles. Just recently the Supreme Court explained this same principle in *Chavez v. United States*, 133 S. Ct. 1103 (2013) by stating "when all we do is apply a general standard to the find of factual circumstances it was meant to address, we will rarely state a new rule for Teague purposes." In Petitioner's case, *Alleyne* should apply retroactively as it did not announce a new rule pursuant to *Griffith* as the logic of *Alleyne* is embedded in the common law analysis in *Hess* and *Winship* way before petitioner's case became final.

In *Alleyne* Justice Clarence Thomas, unequivocally proclaimed "it is obvious, for example that a defendant could not be convicted and sentenced for assault, if the jury only finds the facts for larceny, even if the punishments for each crime are identical. One reason is that each crime has different elements and a defendant can be convicted only if a jury has found each element of the crime of conviction." Since this is so, then Petitioner should not be enhanced six levels in her base offense level by the preponderance standard at sentencing, even if her original unenhanced base offense level carried the same sentence, which Petitioner submits does not.

The sentencing scheme under which Petitioner was sentenced was unconstitutional because it precludes her from notice of enhancements and her right for a jury to find all the necessary, critical and essential structural elements to constitute the punishment. In *Southern Union v. United States*, 132 S.Ct. 2344 (2013), the Solicitor General conceded to this same type of error when he stated in his reply brief that the principles of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its offspring are violated when a court goes outside the jury's traditional common law domain in finding "any fact about how the petitioner committed the offense" which

transforms "the offense into a greater one." *Id.*, at 26. Thus, the Solicitor General's concession in *Southern Union* and the Supreme Court's holing in *Alleyne* supports Petitioner's claim that her sentence enhancements are elements of a Greater Separate Offense, which she did not plead guilty to nor was she given an notice of; thus, her sentence should be corrected.

## *A new substantive Rule*

According to the Supreme Court in *Teague v. Lane*, 488 U.S. 289 (1989), a rule cannot be new if it is dictated by a prior precedent. Therefore, when the Supreme Court announced *Alleyne v. United States*, 133 S.Ct. 2151 (2013), it basically overruled its prior precedent in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) and *Harris v. United States*, 536 U.S. 545 (2002). The Supreme Court's actions created a new rule under its own precedent. See, *Saffle v Parks*, 494 U.S. 484, 488 (1990)("explicit overruling of an earlier holding no doubt creates a new rule").

The new rule announced to *Alleyne* is substantive. Under *Teague*, new rules of criminal procedure do not apply retroactively on collateral review of already final convictions, unless they constitute "watershed rules of criminal procedure." See *Teague*, 489 U.S. at 311. The Supreme Court has held, however, that substantive rules are not subject to *Teague* at all, and they necessarily apply retroactively on collateral review. See *Beard v. Banks*, 542 U.S. 406, 411 footnote 3 (2004)("Rules that fall within what we have referred to as *Teague's* first exception are more accurately characterized as substantive rules not subject to [*Teague's*] bar.") As the Supreme Court has explained, "Teague by its terms applies only to procedure rule." See, *Bousley v. United States*, 523 U.S. 614, 620 (1998). Since the rule announced in *Alleyne* is not solely about procedure and falls within the class of substantive decisions that "prohibit[s] a certain category of punishment for a class of defendants because of that status of offense." See, *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997). *Alleyne* new rule states "because mandatory

23

minimum is an element that must be submitted to the jury." *Id.*, at 2153. Thus, *Alleyne* is properly regarded as "substantive" for *Teague* purposes and applies retroactively to Petitioner's conviction.

The divide between substantive and procedural rules, as it has evolved in the Supreme Court's decisions, reflects the fundamental difference between the way a case is adjudicated (procedure) and the possible outcomes of the case (substantive). Originally, *Teague* borrowed from Justin Harlan's formulation to describe "substantive rules", which should be applied retroactively, as those that place certain primary conduct beyond the realm of the criminal law. *See, Id.*, at 307 (citing *Mackey v. United States*, 401 U.S. 667, 692 (1971) (Harlan, J., concurring). The Supreme Court subsequently expanded the category to include decisions categorically precluding a particular type of punishment or protecting a particular class of persons from such punishment. *See, Penry v. Lynaugh*, 492 U.S. 302, 329-330 (1989)("A new rule placing a certain class of individuals beyond the state's power to punish by death is analogous to a new rule placing certain conduct beyond the state's power to punish at all.") The Supreme Court, thus, summarized that *Teague's* bar on retroactive application does not extend to a substantive categorical guarantee accorded by the constitution; as such a rule prohibits a certain category of punishment for a class of defendants because of their status or offense. *Saffle v. Parks*, 494 U.S. 484, 494 (1990). Thereafter, the Supreme Court again expanded the class of substantive rules in *Bousley*, 523 U.S. at 620-21, by holding that *Teague* does not apply to changes in the substantive scope of a criminal statute that have the effect of placing certain conduct outside of the reach of the law. Therefore, "new substantive rules include decisions that narrow the scope of a criminal statute by interpreting its term, [as well as the decisions] that

24

place a particular conduct or person covered by the statute beyond the state's power to punish."
See, *Schriro v Summerlin* 542 U.S. 348, 351-52 (2004).

Under this analysis substantive rules affect the range of the permissible outcomes of the criminal process, and procedural rules govern the manner of determining those outcomes. To date, the new rules the Supreme Court has treated as substantive have categorically prohibited a particular outcome for a particular class of defendants, regardless of the procedure employed. See, *Summerlin*, 542 U.S. at 352 (citing *Bousley; Saffle*). But the category of substantive rules "includes" such rules, but are not limited to them. 542 U.S. at 35. See, also, *Danforth v. Minnesota*, 552 U.S. at 264, 278 (2008) (*Teague* is grounded in the authority of the courts "to adjust the scope of the writ in accordance with equitable and prudential considerations"). And the category of rules treated as "procedural" are not retroactive, has "regulated only the manner of determining the defendant's culpability." See *Summerlin*, 542 U.S. at 353. Such procedural rules "do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Summerlin*, 542 U.S. at 352. Taken together, the Supreme Court's descriptions of "substantive" and "procedural" rules under *Teague* produce the conclusion that rules that go beyond regulating only the "manner" of determining culpability and instead categorically change the range of outcomes should be treated as substantive rules.

The *Alleyne* rule, which holds that only a jury can determine fact(s) which increase(s) a mandatory minimum, alters the prescribed range of sentences to which a criminal defendant is exposed. *Alleyne*, 133 S.Ct. at 2160. When these facts increase a prescribed range of penalties they become "part of the substantive offense," which under due process clause cannot be found by a judge without the consent of the defendant. *Id.* Therefore, these fact(s) are considered

25

element(s) of the specific illegal conduct that a jury must unanimously find beyond a reasonable doubt or admitted to by a defendant. *Alleyne's* fundamental principles apply to any criminal statute that requires a different fact finding tier, which changes the mandatory minimum sentence to which a defendant is exposed to.

Since the invalidation of regimes that requires fact finding by judges has been invalidated by *Alleyne*, Petitioner submits that *Alleyne* is a substantive change in the law, not solely a procedural one. The *Alleyne* rule does not "regulate only the manner of determining the defendant's culpability." See *Summerlin*, 542 U.S. at 353. Instead, the *Alleyne* rule gives defendants the opportunity to obtain a different and more favorable outcome than was possible before *Alleyne*. *Alleyne* does not simply address the "manner of determining" a defendant's criminal culpability; instead, it expands the proof beyond the reasonable doubt standard to the sentencing phase of criminal proceedings. Thus, it is a substantive rule.

The Honorable Court may still find that *Alleyne* does not differ from previous decisions announcing substantive rules, all of which narrowed, rather than expanded, the range of permissible outcomes of the criminal process by prohibiting a particular outcome without the proper jury finding for a category of defendants. *Alleyne* does categorically hold that a defendant may never be sentenced to an offense that was never charged as the elements for the offense and were never submitted to the jury. *Alleyne* mandates that the sentence taken into account the fact(s) the jury found, and if the fact(s) could have been submitted for a jury to find, but were not, then the court cannot use those facts to enhance a defendant's sentence.

Until *Alleyne* no other case had extended the Sixth Amendment right that the fact(s) that move the statutory maximum apply with equal force to the mandatory minimum by requiring the jury to find the fact(s) that constitutes the punishment. Before this sentencing options were often

26

expanded and allowed the sentencing court to impose a harsher penalty than was available from what the jury verdict or guilty plea supported. *Alleyne* was clearly "unavailable" to Petitioner when her sentence became final on direct review after the Supreme Court denied her petition for Writ of Certiorari.

At sentencing, Petitioner's attorney did in fact argue that the drug type and quantity that the PSR attribute to Petitioner was not what the jury verdict dictated. Counsel also argued that the sentencing enhancements used to enhance Petitioner's base offense level were also sentencing factors which violated her Sixth Amendment right; however, controlling law made counsel's objection futile at the time. Consequently, as clearly stated by the judge in the sentencing transcript, the Court found these factors beyond the preponderance of the evidence standard and sentenced Petitioner to a sentence greater than what the jury verdict allowed. All done in violation of the principle of the common law and the holding of *Alleyne* and thereby produced Petitioner's constitutionally flawed sentence.

As discussed above, the Supreme Court has held that substantive rules like *Alleyne* are retroactively applicable on collateral review. See *Banks*, 542 U.S. at 411 Footnote 3; *Bousley*, 523 U.S. at 620. *Alleyne* should be regarded as a substantive rule for *Teague* purposes under Supreme Court cases. *Banks* established that substantive rules are retroactive and *Bousley* establishes that *Teague* is concerned only with rules of procedure.

Miscarriage of Justice

In modern habeas corpus practice it seems that most of the litigation is focused on procedural hurdles and battles over when claims are filed with the court of review. However, at its core, these statutes were intended to allow those who are unjustly confined to have an opportunity to be heard by a court in order to obtain relief. The animating principle underlying

27

the writ of habeas corpus is fundamental fairness. *Engle v. Isaac*, 456 U.S. 107, 126 (1982). As roadblocks to collateral review have been erected, the Supreme Court has recognized that exceptions to these rules must exist to prevent violations of fundamental fairness. *Id.* at 135. Therefore, the principle of finality "must yield to the imperative of correcting a fundamentally unjust incarceration." *Id.*

A sentence imposed above the otherwise applicable statutory maximum based on a legal error is a fundamental defect, redressable under collateral review, as a sentence above the statutory maximum implicates the separation of powers principle that "the power... to prescribe the punishments to be imposed upon those found guilty of [Federal Crimes] resides wholly with congress." *Whalien v. United States*, 445 U.S. 684,689 (1980). Federal courts do not have the authority to impose a sentence without legislative authorization, and a sentence above the statutory maximum represents just such an unauthorized sentence. See, e.g. *Chapman v. United States*, 500 U.S. 453, 465 (1991) (sentencing court impose any sentence that has been "authorized by statute").

The imposition of an erroneous mandatory minimum sentence is likewise a fundamental constitutional error that raises separation of powers concerns analogous to those implicated by a sentence above the statutory maximum. Congress has the exclusive authority to establish maximum and minimum penalties for a criminal offense. See *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("It is the legislature, not the court, which defines a crime, and ordain its punishment.") When courts commit legal error in determining that a defendant is required to be sentenced to a mandatory minimum term, they transgress the authority that congress established and effectively, erroneously sentenced the accused to a separate offense.

28

In addition, the imposition of a mandatory minimum term based on constitutional legal error significantly affects a defendant's liberty interests in a way that implicates due process. While mandatory minimum punishments are unquestionably valid legislative means to curb judicial discretion, the imposition of mandatory minimum term based on constitutional legal error wrongly deprives the court of discretion to impose a lower sentence after considering the fact the jury found surrounding the offense. The resulting sentence therefore represents an unjustified loss of liberty. The fundamental character of that deprivation is confirmed by the Supreme Court's holding in *Hicks v. Oklahoma*, 477 U.S. 343, 346-347 (1980), which held that a similar error under the state law violated due process because "[t]he defendant... has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest in one that the Fourteenth Amendment preserves against arbitrary deprivation by the state." *Id.*, at 346. Accordingly, the erroneous imposition of a mandatory minimum sentence is a fundamental constitutional defect that warrants correction under a miscarriage of justice exception.

In the absence of relief, Petitioner will serve the rest of her life in prison when the current applicable law shows that she should not have been sentenced beyond what the jury verdict allowed. This is a manifest injustice which implicates separation of powers and due process concerns. Therefore, Petitioner maintains that, in the interest of justice, her sentence should be vacated and she should be resentenced to a term of imprisonment of no more than 10 years.

Issue. III

## WHETHER PETITIONER'S COUNSEL WAS INEFFECTIVE
## BOTH AT THE TRIAL AND APPEAL LEVELS

Ineffective claim

It is well established that "a defendant may raise [a] claim of ineffective assistance of counsel in the first instance on direct appeal if and only if it conclusively appears from the record that counsel did not provide effective assistance. Otherwise, [he] must raise [his] claim in the district court by a collateral challenge pursuant to 28 U.S.C. § 2255", *see, United States v. Smith,* 62 F.3d 641, 651 (4th Cir.1995) (emphasis added) (internal quotation marks omitted). To prevail on an ineffective assistance claim, a petitioner must establish (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* at 688, 104 S.Ct. 2052.  To establish prejudice under *Strickland,* the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* 466 U.S. at 694, 104 S.Ct. 2052. This standard is demanding, given that "[i]n evaluating counsel's performance, Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" to "avoid the distorting effects of hindsight." *Yarbrough v. Johnson,* 520 F.3d 329, 337 (4th Cir.2008) (quoting *Strickland* 466 U. S. at 689, 104 S. Ct. 2052). *See, also, Sexton v. French,* 163 F.3d 874, 882 (4th Cir.1998) (quoting *Strickland v. Washington,* 466 U.S. 668, 689 (1984)).

30

A long and impressive line of federal authority, stretching back over half a century, entitles a criminal defendant to effective assistance of counsel at sentencing. See, e.g., *Strickland v. Washington*, 466 U.S. 668 (1984); *Mempha v. Ray*, 389 U.S. 128 (1967); *Townsend v. Burke*, 334 U.S. 736 (1948). This right requires counsel to not only investigate and offer for consideration "the kind of troubled history relevant to assessing a defendant's moral culpability" *Wiggins v Smith*, 539 U.S. 510, 535 (2003); *Rompilla v Beard*, 545 U.S. 374 (2005) but also research and advance legal arguments pertinent to a defendant's individualized punishment, so long as those arguments are not at odds with controlling authority. To meet this element of an ineffective assistance claim, petitioner would have to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that "the result of the proceeding was fundamentally unfair or unreliable." *Sexton*, 163 F.3d at 882 (internal quotation marks and citations omitted).

Petitioner submits that as attorney, Mr. Michael Montemorano was both her trial and appellate counsel the claim of ineffective assistance of counsel could not have been made before as a conflict of interest would prevent an attorney form making an ineffective assistance claim against him/herself.

## 2-Points Gun Enhancement

The Fourth Circuit Court of Appeals has held that weapons carried by a member of a conspiracy are attributable to a co-conspirator when "under the circumstances of the case, it was fair to say that it was reasonably foreseeable to [the defendant] that his co-participant was in possession of a firearm." *United States v. Kimberlin*, 18 F.3d 1156, 1160 (4th Cir.1994) (quoting *United States v. White*, 875 F.2d 427, 433 (4th Cir.1989)). "Absent evidence of exceptional circumstances, it [is] fairly inferable that a codefendant's possession of a dangerous weapon is

31

foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash." Id. (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir.1991)).

At Petitioner's sentencing, the government relied on *United States v. Hunter*, 19 F.3d 895, and *United States v. Kimberlin, supre*, to support the 2-points enhancement for possession of a firearm by a coconspirator. The Court found it appropriate to increase Petitioner's offense level by two levels because, according to the Court, Petitioner had "been in the business for an extended period of time; that she's [sic] dealt with a variety of people; and that their possession of firearms was reasonable foreseeable and within the scope of the defendant's participation in the drug conspiracy." See Sentencing Transcript, page 80.

Though Petitioner's attorney, Mr. Michael Montemorano did argue at sentencing that there was "no evidence that [Petitioner] counseled, procured, instructed or any other way suggested to any members of the conspiracy that they should possess guns, nor is there even the slightest indicia in any way, shape or form that [Petitioner] ever possess a gun," Mr. Montemorano was ineffective in that he failed to alert the Court to the full standard set forth in *Kimberlin, supra,* which the government cited, and which held that "under the circumstances of the case, *it*" *must be "fair to say* that it was reasonably foreseeable to [the defendant] that his co-participant was in possession of a firearm.'" *United States v. Kimberlin*, 18 F.3d 1156, 1160. (Emphasis added). Moreover, even though the Court did find that it was *reasonable foreseeable* to Petitioner that her coconspirators possessed firearms within the scope of the conspiracy, the Court did not, and Petitioner avow, could not, find that "under the circumstances of the case, *it was fair to say* that it was reasonably foreseeable to [the defendant] that h[er] co-participant was in possession of a firearm.'" *United States v. Kimberlin*, 18 F.3d 1156, 1160. (Emphasis added).

32

Indeed, the evidence at trial did establish that Petitioner was involved in the buying and selling of large quantities of drugs. However, the evidence did not establish enough for one to *fairly say* that "under the circumstances of the case, *it was fair to say* that it was reasonably foreseeable to [the defendant] that his co-participant was in possession of a firearm." *United States v. Kimberlin*, 18 F.3d 1156, 1160 (4th Cir.1994)(Emphasis added).   Certainly, Mr. Montemorano should have been familiar with the dictates of *Kimberlin, supra,* as, according to the government, it was referenced in their opposition brief, which was submitted to the court and a copy of which was supposed to have been served upon Mr. Montemorano.

Furthermore, Mr. Montemorano was further ineffective for failing to argue an additional holding in *Kimberlin, supra*. "Absent evidence of *exceptional circumstances*, it [is] fairly inferable that a codefendant's possession of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances for a large amount of cash." *Id.* (quoting United States v. Bianco, 922 F.2d 910, 912 (1st Cir.1991)). (Emphasis added).   Petitioner maintains that her situation in fact does exhibits *exceptional circumstance* in that the government did not demonstrate that it was "*reasonable foreseeable*" that her coconspirators possessed weapons. The weapons possessed by codefendants Bynum and Dobie were in fact possessed in their homes and the arming of other coconspirators by Mr. Leerily Goodwin was done outside of Petitioner's presence and knowledge. Both of these instances were not *reasonable foreseeable* as by definition the term *reasonable foreseeable* implies that Petitioner, perhaps through a crystal, had the ability to know or foresee beforehand, the arming and possessing of weapons by coconspirators before she engaged them in the buying and selling of drugs.

33

To be sure, Mr. Montemorano was equally ineffective for not objecting to the government's use of *United States v. Hunter*, 19 F.3d 895 at sentencing to support Petitioner's 2-level enhancement for possession of a gun by a coconspirator. The facts in *Hunter, supra*, is distinguishable from Petitioner's case as the government noted that "[i]n [Hunter], Hunter was driven to a drug transaction, dropped off, and when the individual came back to pick him up their car was stopped and the driver of the car had a gun in the vehicle, unknown to Mr. Hunter." See, Sentencing Transcript at page 78. Mr. Montemorano could easily have informed the Court that *Hunter* was not applicable to Petitioner as Petitioner was never found to be in a house where a gun was found, let alone in a car with a gun like Hunter. The evidence at trial clearly did not support a finding that Petitioner ever rode around in cars in which guns were carried, and more importantly, she did not frequent or visited the homes of the coconspirators who possessed the guns in their respective place of residence.

The Sentencing Guidelines itself does not embrace the view that the government took at sentencing neither the one endorsed by the Court. Application note 3 of the Commentary of 2D1.1(b)(1) states that "[t]he enhancement for weapon possession reflects the increased danger of violence *when drug traffickers possess weapons. The adjustment should be applied if the weapon was present*, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." *Id.*, (Emphasis added). Clearly the Guidelines indication that in order for the enhancement to apply the weapons *should be present* was overlooked by the U.S. Attorney, the Court and Petitioner's counsel, as the trial records reflect the fact that Petitioner possessed no weapons nor had any in her presence, neither was she present at locations where weapons were present.

34

To embrace the government's and the Court view that it was "reasonable foreseeable" to Petitioner that her coconspirators *possessed weapons*, one would have to engage in a stretch of the intent and purpose of U.S.S.G. § 2D1.1(b)(1) and its' Application Note 3, as well as an exaggeration of the facts adduced at trial to conclude that Petitioner is entitled to the 2 level enhancement for a weapon that was possessed by her coconspirator. Accordingly, Petitioner maintains that the 2-level enhancement for possession of a firearm was both inappropriate and inapplicable.

#### 4-Points Leadership Role

The Sentencing Guidelines provide that a defendant's sentence is subject to a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." *U.S.S.G.* § 3B1.1(a). Application Note 2 adds that the defendant need not be an organizer or leader of all of the participants involved in the criminal activity so long as he was an organizer or leader "of one or more other participants." *U.S.S.G.* § 3B 1.1 cmt. 2. The Application Notes also provide various factors for consideration in determining whether a defendant is an organizer or leader, such as the "nature of [the defendant's] participation in the commission of the offense," "the degree of participation in planning or organizing the offense," or "the nature and scope of the illegal activity." *U.S.S.G.* § 3B1.1 cmt. 4.

In order to qualify for the role enhancement, the government must present evidence that the defendant lead or organized "participants, as opposed to property, in the criminal enterprise." *United States v. Slade,* 631 F.3d 185, 190 n. 1 (4th Cir.2011); see also *United States v. Cameron,* 573 F.3d at 186 (observing that the Sentencing Commission clarified that the enhancement applies only to defendants who organize, lead, manage, or supervise "'one or more other

35

participants' and not to those who just 'exercise[ ] management responsibility over the property, assets, or activities of a criminal organization'") (quoting U.S.S.G. § 3B1.1 cmt. n. 2).

In determining a defendant's "leadership and organizational role," courts must consider seven factors: (1) the exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others. *U.S.S.G.* § B1.1, cmt. n. 4. See, also, *United States v. Sayles*, 296 F.3d 219, 224 (4th Cir.2002) (discussing the seven-factor test).

In *Sayles*, supra, the Fourth Circuit provided insight regarding the type of evidence needed for a district court to assess a § 3B1.1 enhancement. The defendants in that case, Robert Jared Smith and Leonard Sayles, were participants in a drug distribution conspiracy. The Government presented evidence from coconspirators that both defendants purchased and sold crack to other participants in the conspiracy. Furthermore, one of the co-conspirators testified that Sayles was involved in the conversion of cocaine powder to crack. Based on this evidence, the district court assessed the leadership enhancement to Smith and a lesser two-level enhancement to Sayles. *Id.*, at 220-22.

In reversing the district court's application of the § 3B1.1 enhancements, the Fourth Circuit Court of Appeals held that "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager, or supervisor' of criminal activity." *Id.* at 225. That is because an adjustment under § 3B1.1 is proper "only if it [was] demonstrated that [the defendant] was an

36

organizer, leader, manager or supervisor of people." *Id.* at 226. Without evidence of the defendant's aggravating role in the conspiracy beyond the buying and selling of "significant" quantities of drugs, the Fourth Circuit found that the district court clearly erred in applying the enhancement to the defendants. *Id.* at 226-27.

As in Sayles, the Government in this case failed to present evidence at Petitioner's trial or during her sentencing demonstrating that her role in the conspiracy was that of an organizer or leader of people, as opposed to that of a manager over the drugs that she bought and sold on her own accord and account. At sentencing, the Government represented that Petitioner was "central" and "essential" to the conspiracy, while at the same time referring to her coconspirators as her customers. This tends to suggest that even by the Government's own evidence, Petitioner has a buyer/seller relationship with her coconspirators. Accordingly, Petitioner maintains that that is not enough to warrant a 4-level leadership role enhancement.

There was no evidence that Petitioner planned or organized together the group that the Government charged in the conspiracy, exercised any control or authority over other participants, recruited accomplices into the operation, or claimed any larger share of the fruits of the criminal activity beyond what she negotiated in her buying and selling drug deals she arranged. If anything, the testimony at trial tends to suggests that the coconspirators bought and sold drugs to each other and sometimes pooled their resources to buy larger quantities of drugs. Although it is true that more than one person may qualify as an organizer or leader of a criminal operation, U.S.S.G. § 3B1.1, cmt. n. 4, Petitioner's role in this offense does not amount to that of being a leader/organizer as the Fourth Circuit has already decided in *Sayles*, that the supplying of

37

contraband to other participants in a conspiracy and involvement in illegal transactions, without more, cannot sustain the application of the leadership enhancement. See 296 F.3d at 227.

Although the extensiveness of a criminal activity is a relevant consideration in determining whether the leadership enhancement should apply, U.S.S.G. § 3B1.1 cmt. n. 4, the fact that the conspiracy was found to be "otherwise extensive" does not in and of itself warrant a organizer/leadership role enhancement, as "[i]f the extensiveness of a criminal activity were enough to justify the assessment of the leadership enhancement, then all participants in an extensive operation would be subject to the leadership enhancement regardless of whether there was any evidence that the particular participants were leaders or organizers of the operation." See *United States v. Cameron*, 573 F.3d 179 at 186. "Such an interpretation is clearly contrary to § 3B1.1, which provides enhancements '[b]ased on the defendant's role in the offense.'" *Id.* at 186.

Petitioner's attorney, Mr. Michael Montemorano, was ineffective at sentencing in relationship to the leadership role enhancement because the only defense he offered against the 4-level leadership role enhancement was a twelve-line one-paragraph statement in which he basically asserted that Petitioner had no degree of control over the other participants in the conspiracy. While this may be true, it is not the vigorous defense that is expected of an attorney who is supposed to be an advocate for his client. It should be noted that Mr. Montemorano did not cite any case law or referenced that fact that the enhancement was not appropriate in a buyer/seller relationship. Altogether, by failing to effectively challenge both the 2-levels enhancement for the possession of a weapon by Petitioner's coconspirator, together with the 4-level adjust for being a leader/organizer, Mr. Montemorano ineffectiveness at sentencing clearly

38

"fell below an objective standard of reasonableness," *Id.* at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that "the result of the proceeding was fundamentally unfair or unreliable." *Sexton*, 163 F.3d at 882 (internal quotation marks and citations omitted). This ineffectiveness on behalf of Mr. Montemorano, prejudiced Petitioner in that she was subjecting to an increase of six levels in her base offense level, resulting in Total Offense Level of 44, which produced a mandatory guideline sentence of LIFE imprisonment. Without this, Petitioner was subjected to a Base Offense Level of 38, which carried a guideline sentence of 235-293 months.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully submits that this Honorable Court cure the injustice that has resulted from the ineffective assistance of Petitioner's counsel, Mr. Michael Montemorano, which was presented within this brief, by granting the proper relief to which she may be entitled. Namely, that her current LIFE sentence be vacated and that she be resentenced in accordance with the facts and laws presented within this brief, which Petitioner submits, should be no more than 10 years pursuant to Petitioner's *Alleyne's* argument, or in the alternate, to a 235-months sentence pursuant to Petitioner's original Base offense Level of 38 and Criminal History Category of I.

Date: June 30, 2014

Respectfully submitted,

Paulette Martin, Pro se
Reg. No.: 38350-037
FCI Aliceville, Unit B1
P.O. Box 4000
Aliceville, AL 35442

39

## CERTIFICATE OF SERVICE

I, Paulette Martin, do hereby certify that I have forwarded a true and correct "original" to the United States Attorney Office, 6500 Cherrywood Lane, Suite 400, Greenbelt, Maryland 20770, via First Class U.S. Mail

I, further certify this CERTIFICATE OF SERVICE notice under the penalty of perjury, by declaring that the foregoing is true and correct to the best of my knowledge, pursuant to Title 28 U.S.C. Subsection 1746.

Date: June 30th, 2014

Respectfully submitted,

Paulette Martin, pro se
Reg. No. 38350-037
FCI Aliceville, Unit 1B
P.O. Box 4000
Aliceville, Al 35442

40